Good morning, Your Honors, and may it please the Court. My name is Ashley Martin, and I represent the appellants in this matter. I'd like to reserve two minutes for rebuttal. Your Honors, adjustment of status under Section 1255A requires inspection and admission or parole. There is no dispute in this case that the plaintiff has not been paroled into the United States. Therefore, our dispute lies with whether or not a grant of temporary protected status is an admission. Counsel, can you help me with something? Why is temporary protected status any different from withholding of removal? It's essentially a temporary cessation of an action because of some exterior reason. With cancellation of removal, it may be because it's not safe to send the alien back to the country from which they came. Just to be clear, Your Honor, you're referring to withholding of removal. In that sense, the two are similar in that regard. In that case, though, you would not be urging the same result under a withholding of removal situation, would you? That a person who has been granted withholding of removal would be able to adjust status to lawful permanent resident and remain here forever? Well, Your Honor, I'm not aware of any cases addressing that particular issue, but the government would argue that someone who's been granted withholding of removal has not been admitted to the United States. But that's their argument here, that we have essentially granted them a temporary reprieve from being returned to their home country because, in this case, there were catastrophic earthquakes that made the living conditions there apparently unlivable. Well, that's what the Board discussed in its decision in matter of Sosa Ventura, and the Board clarified that temporary protected status, or TPS, is a temporary shield from the execution of a removal order. And the Board expressly said TPS is a protection, but it is not as great of a form of status as adjustment of status. But to use your terms, doesn't it contemplate the shield being lifted at some point when the conditions improve in El Salvador? It does. The TPS statute does contemplate that because it has a provision for the termination of a country's designation under the TPS program. If this person had come into the country unlawfully, without any inspection at all, but just got here somehow and then got married and there hadn't been any TPS status, what would that person's options be? If there had been no TPS status. That person wants to adjust and have lawful status. What are that person's options? Your Honor, the option in that case is consular processing. So they'd have to leave the country? Correct. And reapply to come back. That is correct. The government's position is here, is it not? Yes, that is our position here. When you get to that position, that's where I run into reality. So we have someone who is here in a temporary protected bubble because of the extraordinary circumstances in their country. And we don't have many of those United States grants in terms of compared to the volume of immigrants. So instead what you're saying is, well, now you live in a country which you really shouldn't be going back to. But the way we interpret the law, you do have to go back. Well, Your Honor, in that regard. Is that a yes or no? Yes, you do? It's a no. You don't have to go back if you want to adjust your status? Not back to the country of citizenship. No, not necessarily. And I would like to refer the Court to a State Department regulation in that regard. It's 22 CFR Section 42.61. But I think that provision, I think that's scribbled in my notes as well. Okay. So this person, this hypothetical person who's in our country unlawfully, no TPS, right, just in our country unlawfully, and gets married and wants to stay, has to leave the country. Maybe not go back to his or her country of origin, but has to leave the United States. Yes. That is the government's position. And, Your Honor, I certainly do not mean to intimate that that is something to take lightly. No, because then you have to go to some other country, possibly illegally. I mean, the reality of how is this really going to work? Your Honor, yes. I mean, it would depend on whether or not the individual in question has a passport that might entitle them to visit another country on a temporary basis. But can I ask you about the terms, because what we're really getting down to in the statute is how we interpret the specific words. Yes. If you have lawful status as a nonimmigrant, that's what you get under the TPS, right, the words? For purposes of adjustment of status and a change of nonimmigrant status, yes. How do you get lawful status as a nonimmigrant without being admitted? Right. Well, Your Honor, my response to that question is this. Congress has deemed certain groups of immigrants as having satisfied Section 1255A's inspected and admitted or paroled requirements. And when Congress has done that, it has used very express, clear language that expressly refers to 1255A or inspection and admission or parole. Well, and so then we take this statute and it says, well, if you want to adjust under 1255, you, the alien, are now considered to have lawful status as a nonimmigrant, correct? So we just answered the question you posed. No, I don't agree. That goes back into 1255. Well, Your Honor, I don't agree with that. Okay. Tell me why. Because 1254AF4 does not refer to 1255A and the inspection and admission or parole requirement. Why would Congress otherwise refer to that requirement? With specificity and provisions such as 1255H, which provides that special immigrant juveniles have been deemed to be paroled into the United States, 1255I, which provides that certain individuals who entered without inspection may adjust without regard to Section 1255A. 1255A itself expressly accepts Petitioners under the Violence Against Women Act from the threshold requirements. Let me see if I understand it. Your argument or the government's essential argument, as I understand it, is that the reference to 1255 can't mean all of 1255, correct? Yes. And the reason for that is that the ---- Even though it says on its plain terms 1255. Because 1254AF4 cannot logically apply to each and every provision of 1255. I mean, there's a provision in 1255 that talks about a presumptive bar to eligibility if someone is seeking to adjust based on a marriage entered into during removal proceedings. Because Congress did not help us out in 1254AF4 by providing us with what ---- Well, let's just stop there, because this is the heart of what we have to get to. Obviously, they say, well, this is for adjusting your status under 1255. So you go to 1255, and you, the alien, are now ---- have maintained your lawful status as a nonimmigrant. Obviously, just because parts of 1255 would be disqualifying because you don't meet them factually, that doesn't mean that somehow the reference to 1255 is directed to some subsection, does it? Well, that's true, Your Honor, and that's a fair point. But I think here, because Congress didn't help us out in 1254 by telling us which subsection it was talking about in the adjustment statute, we have to look at the language that Congress used. And Congress referred to being in and maintaining a lawful status as a nonimmigrant. That most closely correlates with the bar to eligibility at 1255C2, which requires that an applicant must be in a lawful status on the date of filing the application and must have maintained continuously a lawful status since entry. Isn't the practical effect of A4 the ability to obtain a green card and get work in the United States while they're here under TPS? Your Honor, I don't agree with that. The practical effect of 1254AF4 is that the time spent in TPS will not penalize the TPS beneficiary by subjecting them to 1255C2's bar to eligibility based on the period of time spent in TPS. But it's essentially, as you said, it's a shield from being removed while they're in that status, right? A shield from the execution of the removal order. But aren't they allowed to obtain a work permit while they're here in that status? They are allowed to have a work permit. But that in and of itself does not... But you can't get a work permit unless you are in some kind of status, correct? I believe that may be correct. But the government does not dispute that TPS is a status. Right. But the question is whether or not it constitutes an admission. And what I'm wrestling with here is that in order to get eligibility to work here, you have to be in some kind of lawful status. Isn't that right? Because otherwise the illegal aliens can't get green cards legally. Well, Your Honor, I think the government's problem with that is that the relevant question is whether or not we have someone who's been admitted and we have a statutory definition of the term admission. But I'm not sure why from Congress's standpoint we need to go so far as to deem them to be admitted if the purpose of the statute is to protect them from removal while they're in TPS status. Well, if you look at the TPS statute as a whole, there are several provisions that indicate that what Congress intended was that a period of time spent in TPS will not penalize the beneficiary by serving as a bar to eligibility for greater forms of relief, but neither should it provide a path to greater forms of relief. One example of that is 1254A Part E. It wouldn't just provide a path. It would be a leapfrog. Right? It would be leapfrogging over a really important, the inspection and admission requirement. Yes. Precisely, Your Honor. In a better position than they ever would have been in if their country had not had this emergency. Exactly. And received the temporary sanctuary. Exactly. And in that regard, I'd like to refer the Court to its decision in matter of or, sorry, not matter of, but Ortega-Cervantes, which is at 501 F3D1111. And that was not a TPS case, but that was a case in which this Court looked at 1255A's reference to inspection and admission or parole, and the Court explained that what Congress intended with that language was to limit adjustment eligibility to individuals who entered this country lawfully by presenting themselves at a port of entry and submitting to inspection, and Congress intentionally meant to exclude individuals who entered the United States surreptitiously. The appellees are arguing that with 1254AF4, Congress intended for TPS beneficiaries who entered the United States without inspection to adjust just as readily as those who did present themselves at a port of entry. Right. But we do have this problem with this language, quote, being in lawful status as a nonimmigrant. Correct. And it seems to me that being in lawful status as a nonimmigrant is a defined term of art, right? So that's a person who doesn't intend to stay here permanently. A lawful status as a nonimmigrant might, for example, be a person who entered on a work visa or a student visa and hadn't overstayed that visa. Correct. In lawful status. Correct. So putting this hypothetical person who came here unlawfully into this particular status, it is problematic for us. Your Honor, I understand, and I — Can I just — I didn't let you get to my question yet. Sure. There's a case called Medina that has come out more recently. It was in a recent 28J letter. And it argues that a student or a person who came from another country lawfully, in this status, inspected — sorry, lawful status as a nonimmigrant, perhaps can be equated to having been admitted, gone through the inspection and admission process, because they have to present themselves, right, through the appropriate channels to get the visa in the first place. And I don't think you've had a chance to respond to that argument. Your Honor, I'm not sure I understand the question. The question is, there's case law from another circuit that has discussed this and has said that somebody who's in this status, lawful status as a nonimmigrant, is the type of person I just mentioned, someone who's come here lawfully and has gone through maybe not the inspection and admission process per se, but made perhaps a comparable process because they didn't sneak in. They've presented themselves and have obtained a visa after whatever kind of inspection process is required. Do you want to respond to that? Yes. Two responses to that. Again, I think the problem there, though, is that when Congress has addressed this very important threshold requirement at 1255a, it has done so with direct language and not this sort of indirect route that appellees are proposing. You've made that argument. Right. And then another argument is that it's also useful for the Court to look at 1258 here, because 1254a of 4 refers to both adjustment of status under 1255 and a change between nonimmigrant statuses under 1258. And when you look at 1258, there's a reference to the fact that an alien is eligible to change nonimmigrant status if he or she is lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status. So what I'm arguing here is that Congress meant to address both of these statutes, kill two birds with one stone, in effect, and that would be the explanation for Congress' reference to nonimmigrant status and 1254a of 4. Your Honors, I see that my time has expired. Thank you. Thank you. May it please the Court, Christopher Straughan, the Northwest Immigrant Rights Project for Plaintiffs Appellees. Judge Silley correctly concluded, as did the courts in Flores and Medina, that the statutory language here is clear and unambiguous. Subsection F4 of the TPS statute says that a TPS grantee is considered in and maintaining nonimmigrant status for purposes of adjustment and change of status, as counsel for defendants just mentioned. Now, it's a principle of statutory interpretation that you look at the statute in its context. 1255 is about, entitled, adjustment from nonimmigrant to immigrant status. Its very purpose is to facilitate somebody moving from not being in nonimmigrant status to being in immigrant status. Since 1952, when that statutory provision was first enacted, that's been the intention to avoid precisely the situation that's being presented here, that somebody who was in nonimmigrant status would be forced to leave the country and consular process and burden the already overwhelmed consulates with these applications. We do that in other areas. I mean, we talked about that with opposing counsel, where notwithstanding the fact that you've been here for several years under some kind of a status, if you entered without inspection and you married while you were in removal proceedings, we send you outside the country to go through consular processing. That's correct. That is clearly part one way that Congress can address the issue. That is true. So the question is, why doesn't that same analogy apply to somebody who's here under the TPS? The analogy doesn't apply because Congress provided a specific statutory reference, F4, saying that for TPS grantees, you're going to be considered in and maintaining nonimmigrant status. So they singled out that particular group. You would agree with Ms. Martin, though, that that reference to 1255 can't include every subsection of 1255 because there are some that clearly don't apply. Well, it is a reference to 1255 generally. Now, there are a number of different bars that might not apply to a person, but the statutory provision does not specify individual subsections. So that's what the defendants are arguing in this case is, okay, this reference to 1255 doesn't specify 1255a, and therefore it can't waive 1255a. However, they're arguing it from both ways. They're arguing, no, actually it only applies to C2, but the same argument carries with equal force. It doesn't specify only C2. But isn't Judge McEwen's question correct to Ms. Martin that you still have to meet entitlement to the specific prongs in each of the subsections? Yes. And the TPS F4 carve-out is by definition meeting that prong, as Judge McEwen, I think, pointed out. That is, you are only in nonimmigrant status if you have been admitted in that status. That's the question that we were trying to get to, I think, with the reference to Medina, right? So, I mean, we're sort of in a situation where it doesn't say section A, B, C, or D. We know that. It just says 1255. And it seems to me one of the government's best arguments, and I don't know that it is, is that if you take the language in 1254, that the parallel language that you find closest to it is found in C. So what is your response to that? There are several. So outside of the Medina grounds that the reference is to 1255 generally, the other argument is that there is not an exact parallel. The parallel is created only through some significant ellipses eliminating certain terms. And the difference of terms is also clear. In C.2, there is no reference to nonimmigrant. There is only lawful status. F.4 specifically states that TPS grantees are in nonimmigrant status, not just lawful status. And that is critical because nonimmigrant, as was noted by the judges, is a term of art. And nonimmigrant in this saying that it refers to 1255 as a nonimmigrant specifically is in the context of adjustment from nonimmigrants to immigrant status. So that use of the term is important. Isn't the trust of subsection C to permit issuance of the necessary authorization to work here while they are in this temporary protected status program? Well, C.2 only applies to people who are working unlawfully, engaged in unauthorized employment. So it doesn't apply to immediate relatives who are not barred by C.2. But were it not for the fact that they're in the TPS program, then they would be governed by C, would they not? That's exactly right. And TPS at F-4 is explicitly creating these benefits for TPS grantees. And it is an expansion of what you would otherwise be able to do. It's a pretty big expansion. Your theory is a pretty big expansion. Well, we think that's consistent with the language. The defendants are really straining to narrow that very broad language. So the language itself applies to all TPS grantees. It doesn't only say TPS grantees who were lawfully admitted. That's how defendants want to interpret it. What are the options for someone who is in lawful status as a nonimmigrant? Could you just go back to my hypothetical of a person who comes here lawfully on a student visa and has not overstayed or a work visa and has not overstayed? What does that person have to do if that person decides he or she wants to become an immigrant, that is, wants to stay here permanently? Right. So the rules for somebody who is in current nonimmigrant status who then marries a U.S. citizen, for example, can apply to adjust as an immediate relative if they're in nonimmigrant status. And what steps are required of that individual? So they would submit the I-485 application to adjust along with their I-130 application for a visa based on their marriage. Or if they were changing from one nonimmigrant status to another, they would be required to submit the change of status form. Now, I think the change of status is a really good point here because the way it would normally work is a person who comes in in nonimmigrant status, is admitted as a nonimmigrant as the change of status regulation requires, is in status and applies to change, say, from a visitor to a student. Right. They get accepted at UW, so they want to go as a student. They need to be continually in that status to change status. Now, let's say instead the person is a visitor and there's a humanitarian emergency in their country. TPS is granted. They go out of status. Right. They're going to maintain. They've overstayed. Yeah, they've overstayed. So they maintain their visitor status under the TPS statute, and they could later on get admitted to UW, and they would be allowed to change to nonimmigrant student status even though they had overstayed. But that's not the only reach of that. Defendants state in their own memo interpreting that provision. A person who entered EWI, who then, like Mr. Ramirez, who was here for 15 years. I'm sorry. A person who entered without inspection. Okay. Yes. It's the danger of immigration law, the curse of the acronyms. Without inspection. Okay. Yes. A person like Mr. Ramirez who entered without inspection, stayed here for 15 years in TPS status. If he was admitted tomorrow to UW, the plain language of F-4 would consider him to be in and maintaining nonimmigrant status so that he could go to UW as a nonimmigrant. And that is how defendants read the statute. Regardless of whether you entered without inspection or with inspection, we are asking that people who are seeking to adjust their status based on marriage to a U.S. citizen are afforded that same provision and protection under the TPS statute. So isn't that still a temporary status as opposed to permanent? And does that make a difference? Well, F-4 says that it doesn't. For TPS – No, no. I'm asking about your UW hypothetical. If we allow a nonimmigrant, in essence, to adjust status from a visitor to a student, that is still considered to be a temporary benefit, right? Whereas Mr. Ramirez wants a permanent benefit. He wants to become a lawful permanent resident with the opportunity to naturalize and become a U.S. citizen. Yes, and that's precisely what F-4 allows, that you're treated as in and nonimmigrant status. I'm not sure that it does. I mean, why shouldn't it be limited to temporary status while they're in the TPS program, allowing them to work here, to go to school, but with the understanding that at some point that status will end and the person is going to have to go back to the country from which they came. And if they want to get into a naturalization track, then they have to do it the same way we would expect anybody else to do it if they were immigrating from El Salvador. And, in effect, the first answer is they are. These are people like Mr. Ramirez who have been here for 15 years, who are married to a U.S. citizen, have their I-130 approved. But we don't know that when they start the TPS program. I mean, Congress could just as easily, or the Attorney General at the time, could have just as easily a year and a half after granting TPS status said conditions have improved, the country's recovered from the earthquake, the TPS program has ended, and now all these people who are here temporarily have to go home. That is true. But Congress has also stated that it's not going to create only a shield in TPS, but in F-4 it's going to allow a path, a sword, if you will, to allow you to give you the benefit to either adjust to lawful permanent residence or change to nonimmigrant status. So you would not agree with the analogy that I offered to Ms. Martin that this is the same as withholding of removal? If withholding of removal had another statutory provision saying anyone granted withholding of removal shall be considered to be in nonimmigrant status for purposes of adjustment or not change of status, then we'd be looking at the same thing. But here Congress carved out a distinct path. But if a person gets the benefit of withholding of removal, are they not also eligible for work permits and student visas? They're eligible for a work permit. They're not eligible, I would say, to automatically change. They're certainly not eligible to simply change to a nonimmigrant status because they wouldn't be in a valid nonimmigrant status. So under 258. And the withholding of removal does not give them a new label, correct, like the label you get here under 1254? Well, I think it's just different. It's different. I might say it's an apples to oranges. But you don't have the label that we're talking about. I mean, your new label that you get under 1254 is maintaining lawful status as a nonimmigrant. Yes. The TPS statute, exactly. The TPS statute creates a legal fiction. That is, we are going to consider these people. To be in and maintaining nonimmigrant status. They're not. They're TPS grantees. So we have the statutory fiction, but then the government says, well, he's still inadmissible under 1182 because he arrived here illegally. So even if you treat him as inspected and admitted, isn't there some waiver on inadmissibility? So what is your position on the government's statement with respect to that? So there are two points I'd like to make on that. The first is that, as the Medina court found and Flores, that by definition it's axiomatic that when someone is in nonimmigrant status, they're admitted. So we cited to the statute 1184A1, which defines nonimmigrant as somebody admitted in nonimmigrant status. Otherwise, you're an immigrant. The regulation at 245.1 similarly defines lawful status as admitted as a nonimmigrant. The second point is, here we're addressing a program where every TPS grantee has to have been found to be admissible or had their inadmissibility grounds waived. So if they entered without inspection, like Mr. Ramirez, the attorney general waived that ground. Also, they're subject to a rigorous inspection, and if they've committed one felony or two misdemeanors, they're barred. So to get the status, you're saying that you've already passed through that chute. You have gone through an admissibility analysis. Now, I don't think, and this is what Flores and Jadzili found below, you don't even need to reach the issue of am I actually admitted. Rather, you're going to meet the actual admission definition. That was a secondary argument that we made. The argument was that they would be deemed admitted. Exactly. So it's a legal fiction that they're deemed admitted. So the question isn't have they actually been admitted for all purposes of the INA. For purposes of 1255 adjustment and purposes of 1258 change of status, they are considered in and maintaining lawful nonimmigrant status. One of the arguments made is, at least in favor of clients like those you represent, such as Mr. Ramirez, is that it would be odd to make him leave the country and go back to El Salvador to have to come back into the United States. And the government says, well, he doesn't have to go to El Salvador. And do you agree with that? I think that's incorrect. So the general rule of consulate processing is you have to return to your country. In exceptional circumstances, a consulate may in its discretion waive that requirement. It's permitted by RIG. There's a regulation that permits him to do that, counsel. Right. Exceptional. It's not a normal route. No, I can't just request that I'd rather go to Canada than, say, fly to Africa in order to renew my ‑‑ in order to consulate process. I have to show exceptional circumstances. That's in the FAM in order to do that and get the visa. Let's say he can't. Then he would need to wait until the TPS status, the emergency in his country is no more, apparently, and then return there, right? Except by returning, he would trigger other grounds of inadmissibility, potentially, which would bar him from coming back. So for that reason, under the rule of lenity, as mentioned in Negrete Ramirez, we should be considered about construing the statutory term in order to understand that these people are being protected and having a path that permits them to adjust status as nonimmigrants, as inside the U.S., as is the rule for nonimmigrants generally. Mr. Strong, before you sit down, how many people are we talking about here? Do we know how many people there are in the TPS program? I don't know off the top of my head. So for Salvadoran TPS, I believe it's around 70,000 individuals who have Salvadoran TPS. But keep in mind, this provision applies only to those who have an independent ground to change or to adjust status. This is not a blanket grant of adjustment to all Salvadorans. This is if you're married to a U.S. citizen and have an immigrant visa available to you, you can go through that process in the U.S. just as if you were in nonimmigrant status, as F4 says. Now, would you also, there's just one other statutory wrinkle I want to hear from you about, because at least under one aspect of the government's interpretation, it would, in effect, make the people in TPS status who have these relatives by whom they could adjust, it would really make them ineligible by the government's reading of how they square the statute. Could you explain how all that fits together? Sure. This is the point of Medina and Flores and Judge Zille below, that effectively the government's interpretation of the statute renders it effectively meaningless in that almost no one would really be able to take advantage of the statutory provision in terms of having to leave the country, return to a place where there might be some humanitarian emergency triggering certain bars, and the very fact that the C-2 provision that they're arguing is waived would apply really only to a much smaller hypothetical group of people that we could construct, not to persons with immediate relatives. So they would be people without immediate relatives? Yes. So we're imagining some... Well, can you give me, like, I'm always trying to spin that out to reality. Well, who are we talking about? What categories of people? I mean, to me, too, it's a struggle to find, to really think of who would be able to benefit from this extremely broad statutory provision, the narrow way that they've interpreted it. I imagine somebody who enters on a tourist visa, say, from Syria. The situation in Syria blows up right away. You apply for TPS. You're lucky enough to have your TPS granted before your tourist visa expires. Probably not going to happen. Or a student visa. It could be a longer visa. Or a student visa. That's true. If you're on a longer student visa. And then? And then at some point in time, there's another... You marry a U.S. citizen, or you become eligible for some other status and change it. So even though the statute applies to all TPS, F4 applies to all TPS grantees, it would be read to only apply under the defendant's reading, contrary to the plain language we think, to only apply to those who entered in non-immigrant status and who fell under these other categories as benefiting from non-immigrant family members. If you're on an HB1 visa, and then you come from a country like Syria, would you... And that's for a visa for a period of time. Could you adjust into being a TPS status person from your HB1 visa? You could be granted TPS if there was some emergency. So you would hold TPS status. And there's a separate provision under A5 of the TPS statute which says that you can hold one non-immigrant status and TPS status. Okay. So you can kind of be on a dual path under two different statuses. So you could have both of those. That is correct. Okay. Thank you. Thank you. We used up a lot of your time with questions, so I'm going to give you two minutes for rebuttal. And you might want to address the question we raised of if you X out people like Mr. Ramirez and take your position, who gets to benefit under C2? What categories of individuals? Your Honor, the people who benefit from C2 are people who were either admitted or paroled into the United States. They have a non-immigrant status. Their country is designated under the TPS program. And now they have the ability to adjust on a basis other than as an immediate relative. So that would mean those who have a path to adjustment based on an employment visa or a family relationship that is not an immediate relative relationship. One example of that would be the spouse or child of a lawful permanent resident. Another example would be the adult son or daughter of a U.S. citizen or a lawful permanent resident. But you're worse off if you have an immediate relative. Well, well, it would. Under your interpretation. Well, no, no, no. No, I apologize if I was misleading in that regard. That's not the case. You're better off if you're an immediate relative because you have no problem with 1255C2 to begin with. You do have no need for an exemption from that ineligibility ground. However, if you are not admitted or paroled into the United States, regardless of whether or not you have an employment visa, an immediate relative visa, you have a fundamental ineligibility to adjust because you don't satisfy 1255A's threshold requirements. Your Honors, the Court is obligated to interpret a statute in light of its purpose. The TPS statute clearly has a very limited purpose of providing only a temporary shield from the execution of a removal order. With regards to a period of time spent in TPS, the TPS statute clearly contemplates only that that time will not serve as a penalty, triggering ineligibility for a greater form of relief. But neither does the TPS statute provide that this is a ticket to a greater form of immigration status, and I see that I'm out of time. Let me just ask you a question that was also posed to your colleague, and that is not necessarily how many people are in TPS status, but how many people with immediate relative, like Mr. Ramirez, do you have any statistics on that who would, in your view, be able to take a temporary shield and be able to adjust? Those with immediate relative visas? Yes. Your Honor, I don't have any statistics on that. All right, thank you. Okay, thank you. I appreciate both the arguments and the very well-done briefing on both sides here for a very interesting question. The case just argued of Ramirez v. Doherty is submitted.
judges: McKeown, Tallman, Christen